CITY OF AMARILLO 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00133-CV







City of Amarillo, Appellant



v.



Railroad Commission of Texas and Energas Company,


A Division of Atmos Energy Corporation, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT


NO. 93-01609, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING






 Appellant City of Amarillo sued for judicial review of the Texas Railroad
Commission's final order in a contested rate case decided under the Gas Utility Regulatory Act. 
See Tex. Rev. Civ. Stat. Ann. art. 1446e (West Supp. 1995) ("GURA"). The district court
affirmed the Commission's order approving a rate increase for Energas Company. On appeal to
this Court, the City contends that the district court erred in affirming the order because the
Commission: (1) failed to order proper reimbursement of the City's rate case expenses; (2) erred
by allowing Energas to recoup in rates a portion of an "affiliate's" administrative and general
expenses; and (3) improperly adopted Energas's depreciation rates set in a prior docket. We will
affirm the district-court judgment.



BACKGROUND


 The City of Amarillo is a municipality with exclusive original jurisdiction over gas
utility rates within its limits. See GURA § 2.01(a). In February 1992, Energas filed an
application to increase its rates within the City's limits by $4.4 million. The City denied
Energas's request in its entirety based on the recommendations of Diversified Utility Consultants,
Inc. ("Diversified"), rate consultants the City retained to evaluate the application. See id. §
3.03(a) (granting municipality authority to engage rate consultants and other experts to assist in
ratemaking proceedings). Pursuant to its statutory authority, the City assessed Energas with the
consulting costs of $32,076. See id.

 Energas petitioned the Commission for review of the City's adverse rate decision
and the assessment of consulting fees. See id. § 3.05(a). Following its de novo review of
Energas's rate request, the Commission granted a rate increase of $2.13 million. See id. § 3.05(e)
(the Commission hears appeals de novo). The Commission also ordered Energas to reimburse
the City for rate case expenses of $105,966 incurred in legal and consulting fees for the City's
original ratemaking proceeding and for its participation in the appeal to the Commission. Energas
was allowed to recover this cost of reimbursement and its own rate case expenses of $39,980
through a rate surcharge. The City complains that the Commission improperly reduced the City's
rate case expenses and improperly calculated two components of Energas's rate increase.



DISCUSSION


1.  Rate Case Expenses

 In its first seven points of error, the City contests various facets of the
Commission's determination of its rate case expenses as being arbitrary and capricious,
unsupported by substantial evidence, and in excess of the Commission's authority under GURA. 
See Administrative Procedure Act, Tex. Gov't Code Ann. § 2001.174 (West 1995) ("APA"). We
will examine the City's arguments in turn.

 In its seventh point of error, the City asserts that the Commission lacked
jurisdiction to reconsider any portion of the $32,000 in consulting fees the City assessed against
Energas for the original ratemaking proceeding before the city commission. In determining the
City's reimbursable rate case expenses, the Commission disallowed 16.5 hours Diversified
charged for the undocumented work of an analyst, cut Diversified's remaining consulting hours
billed by twenty percent for insufficient documentation, and reduced Diversified's hourly billing
rate for two senior analysts from $75 to $40 an hour. This adjustment reduced the City's
reimbursement for Diversified's services not only in the de novo proceeding before the
Commission but also at the original proceeding before the city commission; the City therefore
complains that the Commission improperly exercised jurisdiction over expenses established by the
City.

 GURA section 3.03(a) provides that a municipality may hire experts to assist or
represent it when conducting or participating in ratemaking proceedings and that "[t]he gas utility
engaged in those proceedings shall be required to reimburse the governing body [of the
municipality] for the reasonable costs of those services to the extent found reasonable by the
applicable regulatory authority." GURA § 3.03(a) (emphasis added). The City argues that
because GURA defines "regulatory authority" as either the Commission or the governing body
of a municipality, the City has exclusive jurisdiction to determine the allowable expenses incurred
to evaluate Energas's initial filing at the local level. See id. § 1.03(6). Conversely, the City
contends that the Commission's appellate jurisdiction is limited to "fix[ing] such rates that the
municipality should have fixed in the ordinance from which the appeal was taken," without
reexamining the City's determination of reimbursable rate case expenses. See id. § 3.05(e).

 The City's proposed interpretation of GURA violates fundamental tenets of
statutory construction. Statutory provisions are read in the context of the act as a whole; courts
will not give one provision a meaning that conflicts with other provisions if the provisions can be
reasonably harmonized. Estate of Padilla v. Charter Oaks Fire Ins. Co., 843 S.W.2d 196, 198
(Tex. App.--Dallas 1992, writ denied). GURA vests in the Commission "exclusive appellate
jurisdiction to review all orders or ordinances of municipalities as provided in this Act." GURA
§ 2.01(b) (emphasis added). An "order" is "the whole or part of the final disposition, whether
affirmative, negative, injunctive, or declaratory in form, of the regulatory authority other than
rulemaking but including rate setting." Id. § 1.03(13). Given this broad grant of jurisdiction to
review all municipality orders, coupled with its authority to conduct appeals de novo, we conclude
that the Commission may reexamine on appeal the rate case expenses a municipality awards in a
local rate proceeding. (1) We overrule the City's seventh point of error.

 Before considering whether the Commission properly determined the reimbursable
rate case expenses under the substantial evidence standard, we will first decide whether the
Commission had before it all evidence necessary to the determination. The examiners excluded
from evidence certain affidavits itemizing the expenses of the City's attorneys and consultants
because the affidavits were filed more than two months after the final rate hearing. The City
argues that the affidavits were timely because the examiners had agreed to accept late-filed
exhibits without setting a specific deadline for submission.

 At the final hearing on September 4, 1992, the examiners agreed to accept late-filed
exhibits from both the City and Energas. Energas filed an expense affidavit on September 30 that
included an itemized estimate of 32 hours for future legal work. On October 2, after a conference
call among the examiners, the City's lead attorney, Diversified's representative and Energas's
representatives, the City filed affidavits itemizing their legal and consulting expenses for
September. On October 12, the examiners filed a proposal for decision. The examiners
subsequently rejected three affidavits the City proffered on November 9 and 12 for expenses
incurred by the city attorney in September and by the City's outside legal counsel for the month
of October. The City made a final request for its outside legal counsel's November expenses in
December, after the Commission had signed its final order.

 The parties appear to concede that GURA and the APA grant the Commission
discretion in the procedural conduct of contested case hearings. We therefore review an agency's
rulings on the admission or exclusion of evidence under the abuse of discretion standard we apply
to trial courts. Cf. Texas Dep't of Human Servs. v. Green, 855 S.W.2d 136, 148 (Tex.
App.--Austin 1993, writ denied). A court abuses its discretion if it acts without reference to
guiding rules and principles, i.e. the act was arbitrary or unreasonable. Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). To prevail on a point of error asserting
abuse of discretion, the party must further show that any error was so injurious or prejudicial that
it constitutes reversible error. See Green, 855 S.W.2d at 148; Landon v. Jean-Paul Budinger,
Inc., 724 S.W.2d 931, 936 (Tex. App.--Austin 1987, no writ).

 The Commission did not abuse its discretion in this case. Despite the examiners'
lack of clarity in setting a deadline for late-filed exhibits, their justification for refusing to file the
affidavits is sound: (1) the affidavits were offered more than two months after conclusion of the
hearing and after the proposal for decision had been issued; (2) the parties had been instructed to
submit estimates for future rate case expenses, which Energas and its outside counsel did; and (3)
the City's affidavit for the city attorney itemized expenses incurred two months earlier during the
hearing. (2) Moreover, the City was alerted to the necessity of submitting all additional rate case
expense documentation or affidavits during the October 2 conference call, which the examiners
clearly organized to tie together loose ends in preparation for issuing their proposal for decision
on October 10. Given the agency's need to close the record in order to reach a decision, we hold
that the Commission did not abuse its discretion in refusing to consider the City's late-filed
expense affidavits. The City's third point of error is overruled.

 Because the only evidence of the city attorney's expenses of $750 was an untimely
affidavit not in the record, we find no error in the Commission's refusal to order reimbursement
for this amount. (3) We overrule the City's sixth point of error.

 The remainder of the City's first seven points of error attack the Commission's
findings as unsupported by substantial evidence in the record. When reviewing an agency
decision for substantial evidence, we presume that the order is valid. Imperial Am. Resources
Fund, Inc. v. Railroad Comm'n, 557 S.W.2d 280, 284 (Tex. 1977). Considering the record as
a whole and without substituting our judgment for that of the agency, we determine whether
reasonable minds could have reached the same decision as the agency. Texas Health Facilities
Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 453 (Tex. 1984); Lone Star Salt
Water Disposal Co. v. Railroad Comm'n, 800 S.W.2d 924, 928 (Tex. App.--Austin 1990, no
writ). The test is not whether the agency reached the correct conclusion, but whether some
reasonable basis exists in the record for the agency's action. Charter Medical, 665 S.W.2d at
452.

 In setting the City's reimbursable rate case expenses, the Commission reduced
Diversified's hourly billing rate for two senior analysts, disallowed the hours charged by a third
analyst, and reduced the remaining hours by twenty percent. Relying on our recent opinion in
City of Port Arthur v. Railroad Commission, 886 S.W.2d 266 (Tex. App.--Austin 1994, no writ),
the City urged at oral argument that its evidence of rate case expenses was uncontested and that
the Commission's reduction of Diversified's fees therefore finds no support in the record. 

 City of Port Arthur is distinguishable from the instant cause. In that case we
criticized the Commission for "opaquely" reducing without explanation the City of Port Arthur's
recoupment of consulting expenses in the face of the consultants' uncontroverted affidavits. See
id. at 272. While acknowledging the Commission's authority to draw inferences and conclusions
based on its experience, we held that the Commission may not reject uncontroverted affidavits and
make its own determination of what expenses are reasonable without "plac[ing] in the record some
explanation or reason upon which the reasonableness of [its] action might be judged in light of
the whole record." Id. at 271 (emphasis added).

 The record here explains and justifies the Commission's finding of fact that
"Diversified's hours billed should be reduced by twenty percent due to insufficiency of support." 
In their proposal for decision, (4) the examiners noted that Jacob Pous, a principal of Diversified,
was present for the entire hearing and that the City's lead attorney relied heavily on Pous in
presenting its case. The examiners remarked, however, that while Pous's presence at the hearing
was necessary and his hourly fee of $125 was reasonable, Pous repeatedly refused the examiners'
request for a breakdown of his time or that of his employees. Because Pous "failed to adequately
explain or support the fees charged by any of [Diversified's] employees," the examiners
recommended a reduction in the hours charged. 

 Unlike City of Port Arthur, in which the Commission reduced the amount of
reimbursable fees because the time charged was "excessive" or "not necessary and relevant" to
the proceeding, here the Commission expressly tied the disallowance to the City's failure to prove
the reasonableness of Diversified's charges. The City has the burden of proving the
reasonableness of rate case expenses for which it seeks reimbursement. 16 Tex. Admin. Code
§ 7.57 (1994). The Commission's function as the ultimate arbiter of "reasonableness" would be
nugatory if it were unable to exact a satisfactory accounting from those seeking reimbursement
for rate case expenses. The City's fifth point of error is overruled. (5)

 The City further complains that the Commission erred by failing to provide for the
cost of an appeal in its order. At the beginning of the hearing, the City estimated its legal fees
for the entire proceeding to be $67,765, including $25,000 for anticipated appeals. This estimate
was entered in the record through the testimony of Mr. Pous, not through the testimony of an
attorney. As previously noted, Pous agreed that the City would be updating its estimates at the
end of the proceeding.

 We conclude that the City's estimated cost of future appeals suffers from the same
infirmities as its other rate case expenses disallowed by the Commission. The Commission found
that the $25,000 estimate was "unsubstantiated by any breakdown of estimated hours and nature
of work to be performed" and disallowed the entire amount based on the hearing examiner's
recommendation. As we held in City of Port Arthur, the Commission may reject a speculative
estimate of future expenses that could easily have been quantified toward the end of the
proceeding. 886 S.W.2d at 272-73. It was unclear whether Pous's estimate for appeals was for
legal fees, consulting fees, or both. Again, the City failed to prove the reasonableness of its
future expenses by adequately breaking down and substantiating them in a way that afforded the
Commission meaningful review. (6)

 Having addressed the remainder of the City's arguments regarding its rate case
expenses, we overrule its first, second, and fourth points of error.



2.  Allocation of Atmos's Administrative Expenses

 Energas is the assumed name of Atmos Energy Corporation ("Atmos"), a Texas
corporation that owns and operates gas distribution systems in Texas, Louisiana, and Kentucky. 
Atmos has three operating divisions: Energas, Trans Louisiana Gas Company, and Western
Kentucky Gas Company. Energas was the original corporate name; after the company acquired
Trans Louisiana and Western Kentucky, the corporate name was changed to Atmos, but the name
Energas was retained for the company's Texas distribution operations. In addition to the three
operating divisions, Atmos has four subsidiaries that serve various constituents in each of the three
states where Atmos operates. As the corporation grew, certain functions were consolidated at
Atmos's general offices in Dallas; all of the divisions and subsidiaries receive some services from
these offices. In points of error eight through eleven the City claims that the Commission
improperly allocated $1,120,000 of Atmos's general office administrative expenses to Amarillo
customers because the allocation (1) did not satisfy the "affiliate transaction standards" of GURA;
(2) was arbitrary and capricious; (3) and was not based on substantial evidence. See GURA §
5.06(b); APA § 2001.174. The Commission and Energas respond that the allocation was not an
"affiliate transaction" as defined by GURA or, alternatively, that the evidence and Commission's
findings satisfied the affiliate transaction standard.

 In fixing a gas utility's rates, the Commission must determine what level of
revenues permits the utility "a reasonable opportunity to earn a reasonable return . . . over and
above reasonable and necessary operating expenses." GURA § 5.03. In any proceeding to
change rates, the utility bears the burden of proof to show that the rate change and changes to the
components thereof, such as invested capital costs or operating expenses, are just and reasonable. 
See id. § 5.04(a). If a utility serves multiple regulatory jurisdictions or encompasses multiple
service areas, the Commission is to fairly allocate the capital costs and expenses between the
jurisdictions. See id. § 5.05(c); 16 Tex. Admin. Code § 7.51(b), (c) (1994). Although the utility
bears the ultimate burden of proving the reasonableness of its expenditures, GURA and the
Commission's rules employ certain presumptions that shift the burden of producing evidence
between the parties. Expenses reflected on a utility's books kept in accordance with Commission
rules are presumed to have been necessarily and reasonably incurred. See 16 Tex. Admin. Code
§ 7.58 (1994). (7)
 The presumption dissolves if "any evidence is introduced that an investment or
expense item has been unreasonably incurred"; if such evidence is introduced, the burden of
production shifts again to the utility to introduce probative evidence of reasonableness. Id. The
Commission and Energas contend that the allocation of Atmos's administrative expenses among
its service areas as recorded in Energas's records was entitled to a presumption of reasonableness
under these rules.

 Under the "affiliate transaction standard" yet another presumption comes into play: 
payments to affiliated interests are presumed excluded from a utility's rate base or operating
expenses unless the utility presents evidence and the Commission finds that (1) each item or class
of items is reasonable and necessary, and (2) the price charged is no higher than that charged to
other affiliates, divisions, or unaffiliated entities. GURA § 5.06(b). (8) Affiliate transactions are
subject to this heightened scrutiny because



when a utility and its suppliers are both owned and controlled by the same holding
company, the safeguards provided by arm's-length bargaining are absent, and ever
present is the danger that the utility will be charged exorbitant prices which will,
by inclusion in its operating costs, become the predicate for excessive rates.



Railroad Comm'n v. Rio Grande Valley Gas Co., 683 S.W.2d 783, 786 (Tex. App.--Austin 1984,
no writ) (quoting General Tel. Co. of Upstate N. Y. v. Lundy, 218 N.E.2d 274, 277 (N.Y. 1966)). 
The City argues that the Commission was bound to apply the affiliate transaction standard to the
allocation of Atmos's administrative expenses to guard against subsidization of Atmos's out-of-state and non-regulated business activities by Amarillo ratepayers. The examiners agreed that the
affiliate transaction standard should apply; without deciding that issue, the Commission concluded
that Energas had presented sufficient evidence to satisfy the heightened requirements of the
affiliate transaction standard. 

 Although we understand the City's concern that Atmos's administrative and general
expenses be equitably allocated between its various businesses and jurisdictions, we are not
persuaded by the City's argument that the allocation constitutes an affiliate transaction. Atmos
and Energas are not "affiliates" or "affiliated interests" as defined by GURA; (9) they are one and
the same, Energas being merely the assumed name and a division of Atmos. Furthermore, the
aim of the affiliate transaction standard is to prevent not only inequitable cost-shifting to
ratepayers but also improper inflation of a "selling" affiliate's revenue by charging prices not
determined through arm's-length bargaining. See id. Because additional revenues were not
realized from the allocation of Atmos's general administrative expenses, there was no danger that
Atmos inflated these expenses or charged Energas exorbitant prices to boost its own bottom line. 
The City's real concern is that the internal expense allocation was unfair. While the legislature
could have provided that intracompany allocations be subject to the stricter scrutiny and burden
of proof required of affiliate transactions, it did not do so. It is axiomatic to statutory construction
that words are presumed to have been used and excluded for a purpose. Cameron v. Terrell &
Garrett, Inc., 618 S.W.2d 535, 540 (Tex. 1981); Southwestern Bell Tel. Co. v. Public Util.
Comm'n, 888 S.W.2d 921, 926 (Tex. App.--Austin 1994, writ requested).

 Rio Grande Valley Gas is distinguishable on this basis. The "allocation" in that
case was a charge to Rio for administrative and general services provided by Rio's separately
incorporated parent and other affiliates. 683 S.W.2d at 786-87. Because Energas and Atmos
were not separately incorporated, they were not affiliates under GURA; therefore, we need not
decide whether the Commission correctly concluded that Energas's evidence also satisfied the
requisites of the affiliate transaction standard.

 The City further urges that Atmos's administrative expenses were not supported
by substantial evidence and were allocated by an arbitrary and capricious method. In Rio Grande
Valley Gas there was evidence, without explanation from the utility, that some of the affiliates
were not allocated any of the general expenses or were not assigned a share of certain types of
expenses. In the instant cause, expenses were assigned using three methodologies: (1) discrete
costs attributable to only one division or subsidiary were "directly assigned"; (2) costs attributable
to a particular aspect of operations were assigned using a "causal allocator" (e.g., general payroll
administrative expenses were assigned based on the number of employees); (3) costs for general
corporate operations, such as financial planning or central records, were assigned using a "general
allocator." Once assigned to a division or subsidiary, a separate percentage was used to assign
costs to specific service areas like Amarillo. The City does not dispute the second factor
apportioning Energas's share of Atmos's administrative expenses to Amarillo; it challenges the
allocation methodologies used to assign Atmos's administrative expenses to Energas.

 As the United States Supreme Court has noted, "The economic judgments required
in ratemaking proceedings are often hopelessly complex." Duquesne Light Co. v. Barasch, 109
S. Ct. 609, 619 (1989). The Commission discharges its statutory duty to balance the interests of
utilities and their consumers by determining whether the utility's invested capital is used and
useful in rendering service, whether the utility's operating expenses are reasonable and necessary,
and whether rates allow the utility a fair return on its investment. See GURA §§ 5.04-.06. The
Commission need not, indeed can not, verify the necessity of each utility expenditure to a
mathematical certainty; GURA requires only that the expenses be "reasonable." Similarly, the
Commission's rules require only that expenses common to different service areas or operations
be apportioned "fairly and justly." 16 Tex. Admin. Code § 7.51(b), (c) (1994).

 The Commission concluded that Atmos's administrative expenses were reasonable
and necessary and that they were fairly and justly apportioned. These conclusions were supported
by individual findings of fact and by a schedule detailing the expenses and the specific allocator
used for each expense category. The record contained substantial evidence to support the amount
of Atmos's expenditures, which the Commission could presume were reasonable under its rules. 
The examiners also discussed the allocation factors at length in their proposal for decision. They
concluded that Energas's "causal" allocators used to assign expenses closely tied to production
factors, such as number of employees or investment in plant and equipment, were reasonable and
that the City's alternate allocation method was not persuasive. Although the City continues to
complain of these causal allocators, it offers no persuasive explanation why those administrative
expenses that arise only in connection with specific production factors should not be apportioned
using a causal allocator or why such an allocator is unreasonable. (10)

 The City most vociferously disputes the allocation of general corporate expenses
derived by applying a "general allocator." Among the larger expense categories allocated using
the general allocator were: chief financial officer, controller, treasury, and investor relations;
executive administration; general accounting; and miscellaneous. Although Energas had proposed
averaging other allocators for plant and equipment, number of employees, number of customers,
and volume of gas handled by the system, the examiners rejected this general allocator, agreeing
with the City that Atmos's divisions or subsidiaries that have no plant, few employees, or a small
number of high-dollar-volume customers would pay too little of the general expenses. The
examiners also rejected the City's proposed alternative general allocator for similar reasons. 
Ultimately, the examiners selected a general allocator based solely on revenue, reasoning that:



[r]evenue is a valid basis for defining cost causation because it reflects the
importance management places upon the operations of a particular division. Thus
a revenue allocation of A&G expenses will more closely reflect the cost causation
characteristics of a division or affiliate as it pertains to administrative and general
costs.



The examiners and the Commission adopted this methodology based on evidence in the record. 
We find nothing so unreasonable in this choice of cost allocation as to make it arbitrary and
capricious.

 Because the allocation of Atmos's administrative and general expenses was not
subject to the affiliate transaction standard under GURA, the Commission properly determined
under its rules that the expenses were reasonable and necessary. Furthermore, the Commission's
allocation methodologies were based on substantial evidence and were not arbitrary or capricious. 
We overrule the City's points of error eight through eleven.



3.  Depreciation Expense

 Energas's existing depreciation rates had been set by the Commission in Docket
5793, a proceeding in which the City participated as a protestant. In the current docket, the
Commission adjusted the depreciation rate for one equipment account, Account 376, (11) but allowed
Energas to continue recording depreciation expense for all other accounts at the rates established
in the earlier docket. In its final three points of error, the City contests the Commission's
adoption of depreciation rates established in a prior case without requiring Energas to demonstrate
the continued reasonableness of those rates. The City contends that by adopting these prior rates
without substantial evidence of their continuing reasonableness, the Commission has improperly
shifted the burden of disproving those rates to the City in violation of GURA.

 We have recently addressed the issue of depreciation rates in the context of the
Public Utility Regulatory Act ("PURA"), Tex. Rev. Civ. Stat. Ann. art. 1446c (West Supp.
1995). See West Tex. Utils. Co. v. Office of Pub. Util. Counsel, No. 3-93-222-CV, slip op. at
10-15 (Tex. App.--Austin Feb. 15, 1995, no writ h.). (12) As we explained in that case, the
Commission is generally bound by its determinations in a prior final order absent a showing of
"changed circumstances." See id. at 13 and cases cited therein. The same rationale that prohibits
a utility from repeatedly relitigating the prudence of its past investments under the doctrines of
res judicata and collateral estoppel prohibits a utility or protestant unhappy with the Commission's
determination of depreciation rates from perennially resurrecting the issue without first proving
that circumstances have changed so as to make the prior order inappropriate. Id. at 13-14; see
also Coalition of Cities for Affordable Util. Rates v. Public Util. Comm'n, 798 S.W.2d 560, 565
(Tex. 1990).

 In the current docket, the City's expert Pous presented evidence on a detailed study
of the service life of distribution mains to show that the 35-year service life Energas used to
compute depreciation for this equipment was inappropriate. Pous evaluated historical data from
Account 376 to demonstrate that the useful service life of the mains was actually closer to 55
years. Based on this testimony the examiners recommended and the Commission adopted an
adjustment to the depreciation rate for Account 376 to reflect this longer useful service life and
to offset the inappropriately rapid depreciation recorded under the earlier rate.

 However, Account 376 was the only plant or equipment account that Pous
examined in detail. As the examiners noted and Pous admitted in his testimony, his recommended
adjustments to the remaining depreciation rates were based only on "his own judgment" and a
general comparison of Energas's rates with the industry's rates as a whole. Because depreciation
rates are company and account specific, the examiners and the Commission were not obligated
to accept this general opinion testimony as sufficient evidence of "changed circumstances." See
West Tex. Utils., slip op. at 12, 15. Accordingly, we hold that the trial court properly affirmed
the Commission's treatment of Energas's depreciation expense and overrule the City's twelfth,
thirteenth and fourteenth points of error.



CONCLUSION


 Having overruled all of the City's points of error regarding the award of rate case
expenses, allocation of Atmos's administrative and general expenses to Energas, and treatment
of Energas's depreciation expense, we affirm the district court's judgment upholding the
Commission's order.



 

 Bea Ann Smith, Justice

Before Chief Justice Carroll, Justices Kidd and B. A. Smith

Affirmed

Filed: March 1, 1995

Publish

1.   Furthermore, GURA does not mandate that a utility recover rate case expenses
through a surcharge on rates; these expenses could be added directly to rates as a
component of cost of service. Were we to accept the City's anomalous construction, the
Commission's appellate jurisdiction would depend on the City's treatment of rate case
expenses as a cost of service included in rates or as a separate surcharge. 
2.   These reasons appear in the examiner's cover letter to their corrected proposal for
decision issued one day after receipt of the late-filed affidavits.
3.   Jacob Pous, a principal of Diversified, had estimated the city attorney's expenses to
be $900 in his pre-filed testimony on July 31, but agreed that the estimate would be
updated at the end of the hearing. The Commission was not bound to accept this
speculative estimate that could easily have been quantified as the proceeding progressed. 
See City of Port Arthur v. Railroad Comm'n, 886 S.W.2d 266, 272-73 (Tex. App.--Austin
1994, no writ). Even though the city attorney's affidavit was dated September 12, the City
failed to file this affidavit until November 9.
4.   The examiners' proposal for decision is part of the record. APA § 2001.060.
5.   The City did not raise specific points of error attacking the Commission's reduction
of the hourly billing rate for Diversified's senior analysts or its disallowance of 16.5 hours
for Cindy Wiley, an analyst with Diversified. We note, however, that the Commission's
actions were again based on recommendations of the hearing examiners, who found that
Wiley's qualifications and time were unsubstantiated by the record and that the data-gathering-and-entry work performed by the senior analysts did not support an hourly
billing rate of $75.
6.   In contrast, Energas's outside counsel anticipated future expenses of $4,800, based
on an estimated 32 hours for preparing exceptions and replies to the proposal for
decision, appearing at Commission meetings, and preparing a motion for rehearing. The
examiners and the Commission found this estimate and breakdown reasonable.
7.   The City challenges only the applicability of the presumption; it does not attack the
validity of the Commission's rule per se. We note in passing, however, that the rule does
not appear unreasonable in light of the Commission's extensive authority to regulate the
utility's record-keeping outside the ratemaking context: the Commission may prescribe
the utility's accounting methods, require reports useful in the administration of GURA,
establish the form and timing of these reports, and inspect the premises, records,
management and affairs of the utility at will. See GURA §§ 4.01-.03. 

8.   The parties have not briefed the issue of whether the presumption of reasonableness
under Commission rule 7.58 applies to the first part of this affiliate transaction test. We
need not address the issue, however, in light of our disposition.
9.   GURA defines "affiliated interest" or "affiliate" as:


(A) any person or corporation owning or holding, directly or indirectly, five
percent or more of the voting securities of a gas utility;


(B) any person or corporation in any chain of successive ownership of five
percent or more of the voting securities of a gas utility;


(C) any corporation five percent or more of the voting securities of which is
owned or controlled, directly or indirectly, by a gas utility;


(D) any corporation five percent or more of the voting securities of which is
owned or controlled, directly or indirectly, by any person or
corporation that owns or controls, directly or indirectly, five percent or
more of the voting securities of any gas utility or by any person or
corporation in any chain of successive ownership of five percent of such
securities;


(E) any person who is an officer or director of a gas utility or of any
corporation in any chain of successive ownership of five percent or more
of voting securities of a gas utility;


(F) any person or corporation that the railroad commission, after notice
and hearing, determines actually exercises any substantial influence or
control over the policies and actions of a gas utility, or over which a gas
utility exercises that control, or that is under common control with a gas
utility, that control being the possession, directly or indirectly, of the
power to direct or cause the direction of the management and policies of
another, whether that power is established through ownership or voting
of securities or by any other direct or indirect means; or


(G) any person or corporation that the railroad commission, after notice
and hearing, determines is actually exercising such substantial influence
over the policies and action of the gas utility in conjunction with one or
more persons or corporations with which they are related by ownership
or blood relationship, or by action in concert, that together they are
affiliated with the gas utility within the meaning of this section, even
though no one of them alone is so affiliated.


GURA § 1.03(8).
10.   The City also attempts to challenge the directly assigned costs under the affiliate
transaction standard; having concluded that standard does not apply here, we will not
address this argument.
11.   The proposal for decision and the Commission's final order erroneously refer to
this account for distribution mains as Account 976.
12.   Counsel for both parties acknowledged at oral argument that our decision in West
Texas Utilities would control the dispute in this cause.